**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| FIREARMS REGULATORY ACCOUNTABILITY COALITION, INC., *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:23-cv-00003-DLH-CRH |
| MERRICK B. GARLAND, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND ................................................ 3

STATEMENT OF UNCONTESTED MATERIAL FACTS ........................................ 6

    A.    ATF's Misclassification of the Reformation And Failure To Promulgate Procedures For Selling, Delivering, And Transporting Interstate GCA-Only Short-Barreled Shotguns. ............................................................................... 6

    B.    ATF's Misclassification Of The FAI-15 Antithesis. ................................... 10

I.    THE COURT SHOULD GRANT PLAINTIFFS SUMMARY JUDGMENT ON THE REFORMATION COUNTS ....................................................................... 13

    A.    ATF's Classification Of The Reformation Was Unlawful. ....................... 13

        1.    The Reformation Is Neither An NFA Nor GCA Short-Barreled Shotgun Because It Does Not Have A Smooth Bore. ................................ 13

        2.    The Reformation Is Not An NFA Short-Barreled Shotgun Because It Is Not Chambered For Shotgun Shells. ................................... 17

    B.    ATF Has Unlawfully Delayed Promulgation Of Procedures For GCA-Only Short-Barreled Shotguns. ........................................................................... 25

    C.    ATF's *De Facto* Ban On GCA-Only Short-Barreled Shotguns Is Arbitrary And Capricious. ...................................................................................... 33

II.    THE COURT SHOULD GRANT PLAINTIFFS SUMMARY JUDGMENT ON THE FAI-15 ANTITHESIS COUNT ................................................................. 33

    A.    ATF Misconstrued The Statutory Definition Of "Rifle." ....................... 34

    B.    All Marketed Capabilities Are Part Of Product Design. .......................... 35

    C.    Multiple-Projectile Capability Is Central To The FAI-15 Antithesis's Design. ..... 36

CONCLUSION ......................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Rifahe v. Mayorkas,*
776 F. Supp. 2d 927 (D. Minn. 2011) ................................................................. 27

*Am. Bioscience, Inc. v. Thompson,*
269 F.3d 1077 (D.C. Cir. 2001) ......................................................................... 12

*ANR Storage Co. v. FERC,*
904 F.3d 1020 (D.C. Cir. 2018) ......................................................................... 33

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ........................................................................................... 24

*Cargill v. Garland,*
57 F.4th 447 (5th Cir. 2023) ......................................................................... 17, 23

*City of Chicago, Illinois v. Fulton,*
141 S. Ct. 585 (2021) ......................................................................................... 20

*CropLife Am. v. EPA,*
329 F.3d 876 (D.C. Cir. 2003) ........................................................................... 32

*Dep't of Com. v. New York,*
139 S. Ct. 2551 (2019) ....................................................................................... 33

*Duncan v. Walker,*
533 U.S. 167 (2001) ........................................................................................... 20

*Elkhatib v. Butler,*
No. 04–22407–CIV-SEITZ, 2005 WL 5226742 (S.D. Fla. June 7, 2005) ............ 26

*Grace Healthcare of Benton v. HHS,*
603 F.3d 412 (8th Cir. 2009) ............................................................................. 12

*Gross v. FBL Fin. Servs., Inc.,*
557 U.S. 167 (2009) ........................................................................................... 20

*Guedes v. ATF,*
140 S. Ct. 789 (2020) ......................................................................................... 23

*Gustafson v. Alloyd Co.,*
513 U.S. 561 (1995) ........................................................................................... 16

*Han Cao v. Upchurch*,
496 F. Supp. 2d 569 (E.D. Pa. 2007) ..................................................................26

*Hardin v. ATF*,
65 F.4th 895 (6th Cir. 2023) ....................................................................17, 23

*Indep. Petrol. Ass'n of Am. v. DeWitt*,
279 F.3d 1036 (D.C. Cir. 2002) .........................................................................37

*Inhabitants of Montclair Twp. v. Ramsdell*,
107 U.S. 147 (1883) ...........................................................................................20

*Innovator Enters., Inc. v. Jones*,
28 F. Supp. 3d 14 (D.D.C. 2014) .......................................................................34

*Irshad v. Johnson*,
754 F.3d 604 (8th Cir. 2014) ........................................................................26, 27

*Kloeckner v. Solis*,
568 U.S. 41 (2012) ..............................................................................................22

*Liu v. Chertoff*,
No. CV–06–1682–ST, 2007 WL 2435157 (D. Or. Aug. 29, 2007) ...................26

*Marbury v. Madison*,
5 U.S. 137 (1803) ...............................................................................................20

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
336 F.3d 1094 (D.C. Cir. 2003) ....................................................................26, 27

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011) ............................................................................................22

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................................................... *passim*

*New Prime Inc. v. Oliveira*,
139 S. Ct. 532 (2019) ..........................................................................................14

*Ovintiv USA, Inc. v. Haaland*,
No. 1:21-CV-2552-RCL, 2023 WL 2708821 (D.D.C. Mar. 30, 2023) ..............37

*Parents Involved in Community Schools v. Seattle School District No. 1*,
551 U.S. 701 (2007) ............................................................................................30

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
469 U.S. 189 (1985) ............................................................................................21

*In re Pub. Emps. for Env't Resp.*,
  957 F.3d 267 (D.C. Cir. 2020) ..............................................................25, 26

*Reves v. Ernst & Young*,
  494 U.S. 56 (1990)......................................................................................14

*Sec. & Exch. Comm'n v. Chenery Corp.*,
  318 U.S. 80 (1943)......................................................................................24

*Sig Sauer, Inc. v. Brandon*,
  826 F.3d 598 (1st Cir. 2016) ...................................................................5, 36

*South Dakota v. Ubbelohde*,
  330 F.3d 1014 (8th Cir. 2003) .....................................................................32

*Sparks v. Oxy-Health, LLC*,
  134 F. Supp. 3d 961 (E.D.N.C. 2015) ..........................................................35

*Sw. Airlines Co. v. Saxon*,
  142 S. Ct. 1783 (2022)................................................................................14

*United States v. Pulsifer*,
  39 F.4th 1018 (8th Cir. 2022) ................................................................20, 34

*United States v. Spinner*,
  152 F.3d 950 (D.C. Cir. 1998) .....................................................................15

*United States v. Thompson/Ctr. Arms Co.*,
  504 U.S. 505 (1992)........................................................................17, 23, 35

*United States v. W. T. Grant Co.*,
  345 U.S. 629 (1953)....................................................................................30

*W. Virginia v. EPA*,
  142 S. Ct. 2587 (2022)................................................................................30

*W. Virginia v. EPA*,
  No. 3:23-CV-032, 2023 WL 2914389 (D.N.D. Apr. 12, 2023) (Hovland, J.)......................17

*Wisconsin Cent. Ltd. v. United States*,
  138 S. Ct. 2067 (2018)...........................................................................14, 16

**Statutes**

27 C.F.R. § 478.92 .........................................................................................4, 38

27 C.F.R. § 479.61 ..........................................................................................5

27 C.F.R. § 479.62 ..........................................................................................5

27 C.F.R. § 479.66 ...................................................................................5

27 C.F.R. § 479.84 ...................................................................................5

27 C.F.R. § 479.85 ...................................................................................5

27 C.F.R. § 479.101 .................................................................................5

27 C.F.R. § 479.102 .................................................................................5

28 C.F.R. § 0.130 .....................................................................................6

28 C.F.R. § 0.131 .....................................................................................5

5 U.S.C. § 555 ........................................................................................27

5 U.S.C. § 706 ....................................................................6, 12, 25, 33

18 U.S.C. § 921 ...........................................4, 13, 19, 34, 35

18 U.S.C. § 922 .................................................5, 6, 24, 32

18 U.S.C. § 923 .........................................................................................5

18 U.S.C. § 924 .........................................................................................6

26 U.S.C. § 5801 .......................................................................................3

26 U.S.C. § 5812 .......................................................................................5

26 U.S.C. § 5822 .......................................................................................5

26 U.S.C. § 5841 .......................................................................................5

26 U.S.C. § 5845 ................................................................................ *passim*

26 U.S.C. § 5871 .......................................................................................5

35 U.S.C. § 154 ...............................................................................10, 29

Pub. L. No. 90-618 82 Stat. 1213 (1968) ...............................19

Pub. L. No. 105-277, 112 Stat. 2681 (1998) ........................19

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .............................................................................21

ATF, *ATF Myths*, tinyurl.com/msw9cwfv (last visited June 26, 2023)........................33

*ATF National Firearms Act Handbook-Introduction*, at 1 (Rev. 2009), https://www.atf.gov/firearms/docs/undefined/atf-national-firearms-act-handbook-introduction ..................................................................................22

The Century Dictionary (1914) ..............................................................15, 16

Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720 (May 21, 2021) ..........................................................................5

Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) ..................................................................4, 32

Funk & Wagnalls Comprehensive Standard Dictionary of the English Language (1934) ..........................................................................................15

Press Release, National Association of Sporting Goods Wholesalers & Professional Outdoor Media Association, NASGW Announces Award Winners at the 2019 NASGW Expo (Oct. 24, 2019), https://tinyurl.com/2hxpnp7a ....................................................................29

Tom Faulkner, "How to Choose the Best Cartridge," *Popular Mechanics*, Vol. 142, No. 6 (Dec. 1974) ..........................................................................18

Webster's New International Dictionary (1923) ...........................................16

William N. Eskridge Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* (2016) ........................................................................21

## INTRODUCTION

For more than four years, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has refused to promulgate statutorily required procedures for selling and transferring legal weapons purportedly regulated by the Gun Control Act ("GCA"). Plaintiffs filed suit to remedy that unlawful delay and to challenge the agency's arbitrary and capricious classification of another weapon.

Remarkably, ATF's response to this suit has been further delay. Sixty-four days after the Complaint was served, ATF asked Plaintiffs for *even more time* to act. Defs.' Unopposed Mot. for Extension of Time, ECF No. 6. Assuming the request was made in good faith, Plaintiffs agreed to a litigation-deadline extension based on representations that ATF was "considering the relief Plaintiffs requested," *id.*, and with the understanding that ATF would update Plaintiffs on its progress and discuss a briefing schedule depending on ATF's decision. *See* Pls.' Mem. Supp. Mot. for Summ. J. Ex. 1, ECF No. 13-1. But after that additional time elapsed without any updates, ATF—with about an hour's notice—filed a 27-page motion to dismiss with a hodgepodge of meritless jurisdictional and venue arguments. That motion asked for still *more time* to act and requested that the Court decide its baseless motion in the meantime so that ATF could avoid having to act at all. *See* Defs.' Mem. Supp. Mot. To Dismiss 3 n.1, ECF No. 9 ("Gov. First MTD").[1]

When Plaintiffs responded with a motion for summary judgment—and ATF thus faced the prospect of this Court reviewing its conduct on the merits—ATF reclassified one of the firearms at issue in this case (the Reformation) as both a GCA *and* National Firearms Act ("NFA") firearm in an attempt to moot Plaintiffs' challenge. *See* Am. Compl. Ex. Q, ECF No. 22-17. This required Plaintiffs to amend their complaint to challenge the merits of the new classification, causing still

---

[1] ATF has since renewed that motion, which Plaintiffs intend to oppose. *See* ECF Nos. 23, 24.

more delay. ATF then needlessly waited the full two weeks to consent to Plaintiffs' motion to amend (Plaintiffs had sought that consent long before they filed their motion). And Plaintiffs are now required to refile—and spend significant resources revising—this motion for summary judgment. Perhaps most egregious, ATF premised its latest delay tactic on an utterly indefensible construction of the NFA's text, which does not permit the agency to regulate the Reformation.

Enough is enough. This Court should grant Plaintiffs' motion for summary judgment and issue the relief Plaintiffs have been owed for years. The Court should rule for Plaintiffs on Count II, which challenges ATF's two-fold misclassification of the Reformation. As the plain language of both the GCA and NFA make clear, the Reformation cannot be regulated as a firearm under either statute. Indeed, neither the NFA's nor GCA's definition of "shotgun" can properly apply to a firearm like the Reformation, which lacks a "smooth bore" and therefore fails to satisfy a fundamental requirement prescribed by the statutes. Moreover, the agency's decision to apply the NFA to the Reformation is directly contrary to ATF's prior interpretation, and rather than a sincere attempt at construing the statute, is a transparently pretextual effort to create a database of records that would otherwise be prohibited were the Reformation regulated under the GCA exclusively.

Likewise, the Court should decide in Plaintiffs' favor on Count III (unreasonable delay) because ATF has taken ***more than four years*** to promulgate a procedure for GCA-only weapons, which requires ATF merely to create a new version of a form that already exists for the authorization of other weapons. The action required of ATF is thus essentially a "copy and paste" job; federal agencies (including ATF) regularly complete far more complex tasks in a fraction of the time. And ATF has identified no reason why this action need take an extraordinarily long time, let alone why it has responded to this suit with gamesmanship and even more delays. The Administrative Procedure Act ("APA") provides unambiguously that courts "shall" compel

agency action "unreasonably delayed," and that standard is easily met here.

The Court should also grant summary judgment on Count IV (arbitrary-and-capricious enforcement policy) because ATF's delay acts as a *de facto* ban on the sale and transfer of GCA-only weapons. Because ATF has given no reason for the ban, and because the ban is inconsistent with ATF's decision to authorize other weapons Congress intended to be **more** regulated, the ban is arbitrary and capricious. ATF has no authority to ban GCA-only weapons.

Finally, the Court should grant summary judgment on Count I, which concerns ATF's misclassification of a weapon manufactured by Franklin known as the FAI-15 Antithesis. That weapon fires both single projectiles and multiple-projectile shot. Because Congress defined "rifle" as a weapon designed to "fire only a single projectile," among other things, the FAI-15 Antithesis is not a rifle. But ATF classified the weapon as a rifle anyway for reasons that do not withstand scrutiny. ATF confused necessary conditions in the "rifle" definition for sufficient conditions, wrongly assumed that only central design features are part of a product's design, and ignored abundant objective record evidence reflecting that the FAI-15 Antithesis's shot-firing capability **is** central to its design. The Court should vacate ATF's arbitrary and capricious misclassification.

## STATUTORY AND REGULATORY BACKGROUND

Congress has devised a comprehensive scheme of firearm regulation through two statutes: the National Firearms Act, 26 U.S.C. § 5801 *et seq.*, and the Gun Control Act, 18 U.S.C. § 921 *et seq.* These statutes regulate weapons by type, imposing more stringent requirements on, *inter alia*, "short-barreled rifles" and "short-barreled shotguns."

As relevant here, a "short-barreled shotgun"[2] is a shotgun with "one or more barrels less

---

[2] The NFA does not use the term "short-barreled shotgun." Instead, "a shotgun having a barrel or barrels of less than 18 inches in length" is termed a "firearm." 26 U.S.C. § 5845(a)(1). For simplicity, Plaintiffs generally refer to such weapons as short-barreled shotguns.

than eighteen inches in length" or "an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(6) (GCA); 26 U.S.C. § 5845(a)(1), (2) (similar definition in NFA). Weapons are "shotguns" under the GCA if designed and intended "to be fired from the shoulder and . . . use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger." 18 U.S.C. § 921(a)(5). Weapons are "shotguns" under the NFA if they qualify as GCA shotguns and are also designed and intended to "use the energy of the explosive in a fixed shotgun shell." 26 U.S.C. § 5845(d).

The statutory definition for "short-barreled rifles" is similar. As relevant here, a "short-barreled rifle"[3] is a rifle with "one or more barrels less than sixteen inches in length" or "an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8) (GCA); 26 U.S.C. § 5845(a)(3), (4) (similar definition in NFA). Weapons are "rifles" if they are designed and intended "to be fired from the shoulder and . . . use the energy of an explosive to fire *only a single projectile* through a rifled bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7) (GCA) (emphasis added); 26 U.S.C. § 5845(c) (similar definition in NFA).

Entities may voluntarily submit weapons to ATF for classification under the statutes. *See* 27 C.F.R. § 478.92(c); *accord* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652, 24,709–10 (Apr. 26, 2022) (Final Rule). Upon receipt, "[t]he Director may issue a determination (classification)," 27 C.F.R. § 478.92(c), typically through a "private letter ruling." 87 Fed. Reg. at 24,710. ATF's classifications are "authoritative" as to the submitted sample. 27 C.F.R § 478.92(c); *accord* 87 Fed. Reg. at 24,710 (classification letters "have the force of law"). While ATF formally codified its classification process last year, the agency employed it

---

[3] The NFA also does not use the term "short-barreled rifle." Instead, "a rifle having a barrel or barrels of less than 16 inches in length" is termed a "firearm." 26 U.S.C. § 5845(a)(3). For simplicity, Plaintiffs generally refer to such weapons as short-barreled rifles.

"[f]or many years" prior to codification. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27,720, 27,733 (May 21, 2021) (Proposed Rule); *see Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 & n.1 (1st Cir. 2016) (reviewing ATF classification letter).

ATF's classification decisions carry significant regulatory consequences. A weapon classified as a "firearm" under the NFA—a term that includes short-barreled shotguns and short-barreled rifles—is subject to the most burdensome regulatory requirements:

- Anyone who makes an NFA firearm must submit an application to ATF with identifying information—including his fingerprints—and must pay a $200 tax. 26 U.S.C. § 5822; 27 C.F.R. §§ 479.61, 479.62.

- Anyone who transfers an NFA firearm must also submit an application to ATF with identifying information and must pay an additional $200 tax. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.66, 479.84.

- Anyone who receives an NFA firearm must provide ATF with his fingerprints and notify his local police department of the transfer. 26 U.S.C. § 5812; 27 C.F.R. §§ 479.84(c), 479.85.

- Anyone possessing an NFA firearm must register himself and his NFA firearm in a federal database. 26 U.S.C. § 5841; 28 C.F.R. § 0.131(d); 27 C.F.R. §§ 479.101, 479.102.

- Anyone who violates the NFA may be imprisoned for up to ten years and fined up to $10,000. 26 U.S.C. § 5871.

A weapon classified as a short-barreled rifle or short-barreled shotgun under the GCA is subject to substantial—though less onerous—statutory rules governing sale, delivery, and interstate transportation. The GCA's rules often turn on whether the relevant actor holds a federal firearms license ("FFL")—*i.e.*, a license issued by the Attorney General "to transport, ship, and receive firearms and ammunition covered by such license in interstate or foreign commerce during the period stated in the license." 18 U.S.C. § 923(c). Only FFL holders may "engage in the business of importing, manufacturing, or dealing in firearms." *Id.* § 922(a)(1)(A).

FFL holders may "sell or deliver" GCA short-barreled weapons to unlicensed persons only "as specifically authorized by the Attorney General consistent with public safety and necessity." *Id.* § 922(b)(4). Unlicensed individuals may "transport" short-barreled weapons "in interstate or

foreign commerce" only "as specifically authorized by the Attorney General consistent with public safety and necessity." 18 U.S.C. § 922(a)(4). Those who sell, deliver, or transport short-barreled weapons without a required authorization from the Attorney General may be imprisoned for up to five years and fined up to $500,000. 18 U.S.C. §§ 924(a)(1)(B), (D); 3571(c)(3); 3559(a)(5). The Attorney General has delegated to ATF his authority under the GCA to authorize transferring and transporting short-barreled weapons. 28 C.F.R. § 0.130(a)(1).

## STATEMENT OF UNCONTESTED MATERIAL FACTS[4]

Plaintiffs challenge two discrete ATF actions in this case and one inaction: (1) The erroneous classification of the Reformation as a short-barreled shotgun under the NFA and the GCA, (2) the failure to promulgate a statutorily-required process—after the agency promised it would—for parties to sell, deliver, and transport across state lines weapons classified as short-barreled shotguns under only the GCA, and (3) the erroneous classification of the FAI-15 Antithesis as a short-barreled rifle under the NFA and the GCA.

**A.      ATF's Misclassification of the Reformation And Failure To Promulgate Procedures For Selling, Delivering, And Transporting Interstate GCA-Only Short-Barreled Shotguns.**

On July 7, 2017, Franklin asked ATF to classify a new barrel design called the "NRS" barrel—short for "Not a Rifle or Shotgun"—that Franklin would use on its forthcoming "Reformation" line of firearms, which, like the FAI-15 Antithesis, are designed primarily for hunting. *See* Am. Compl. Ex. G, ECF No. 22-7. Franklin explained that the NRS barrel would

---

[4] While there can be no meaningful factual dispute regarding the merits of this matter because review is confined to the administrative record, *see* 5 U.S.C. § 706, Plaintiffs provide this abridged summary of key material facts both to assist the Court and to comply with Local Civil Rule 7.1(A)(2). By contrast, the inaccurate facts ATF relies on to challenge venue and standing are derived largely from unfounded assumptions not based on information in the administrative record and not relevant to summary judgment.

"feature straight cut lands and grooves" "from the leade ahead of the chamber all the way to the muzzle." *Id.* at 1 (emphasis omitted). Franklin reasoned that the NRS barrel would not qualify as a rifle under the NFA or the GCA because it would not utilize a rifled bore and that it would not qualify as a shotgun because it would not have a smooth bore. *Id.* at 1–4.

Franklin's submission prompted a back-and-forth in which the agency repeatedly moved its goalposts. In July 2017, ATF responded to Franklin's letter, telling Franklin via email that ATF would not classify the NRS unless Franklin submitted "a physical sample." *See* Am. Compl. Ex. H, ECF No. 22-8. In August 2017, Franklin submitted an NRS barrel. *See* Am. Compl. Ex. I, ECF No. 22-9. In March 2018—nearly seven months later—ATF told Franklin it would not classify the NRS barrel unless the physical sample were installed on a "complete firearm." *See* Am. Compl. Ex. J, ECF No. 22-10. Less than a week later, Franklin resubmitted the NRS barrel affixed to four different weapons from its Reformation series (collectively, "Reformation"). *See* Am. Compl. Ex. K, ECF No. 22-11.

In November 2018—eight months after Franklin resubmitted the NRS barrel, and more than 16 months after Franklin's original submission—ATF's Firearms Technology Industry Services Branch ("FTISB") classified the Reformation as a short-barreled shotgun under the GCA only. Am. Compl. Ex. L, ECF No. 22-12. ATF agreed that the Reformation is not a rifle. *See id.* at 4. But ATF found that the Reformation is a shotgun under the GCA because the Reformation's "lands and grooves are not 'rifling.'" *Id.* ATF did not dispute that the Reformation does not fire through a smooth bore. *See id.* at 4–5.

ATF did not classify the Reformation under the NFA at all. *See* Am. Compl. Ex. L at 5. In January 2019, Franklin asked ATF to clarify whether the Reformation is a short-barreled shotgun under the NFA. *See* Am. Compl. Ex. M, ECF No. 22-13. ATF never responded to this

letter. But in November 2019, ATF's Firearms Industry Programs Branch ("FIPB") sent Franklin a letter opining that information "on [Franklin's] website regarding the transfer and interstate transport of [its] Reformation firearm d[id] not accurately reflect the provisions required for the transfer and interstate transport of a short barreled shotgun as required under [the GCA]." Am. Compl. Ex. N at 1, ECF No. 22-14. ATF stated that it had classified the Reformation as a "short barreled shotgun (SBS) as defined by the Gun Control Act (GCA) but [did] not [find the Reformation] to be a firearm regulated under the National Firearms Act (NFA)." *Id.* ATF opined that its regulations governing the transfer and interstate transport of short-barreled shotguns were "limited to NFA firearms" and thus did not govern GCA-only short-barreled shotguns. *Id.* at 1–2.

Acknowledging that its position created a "gap in the federal firearm regulations," ATF represented that it was "currently developing the procedures and forms" to "provide the mechanism necessary for FFL holders and owners of [GCA-only short-barreled shotguns] to request the statutorily required approvals." *Id.* at 2. In the meantime, ATF asserted that FFL holders such as Franklin "may not lawfully transfer the Reformation to a non-licensee" and that "the owner of a [GCA-only short-barreled shotgun], such as the Reformation, may not lawfully transport the firearm across state lines." *Id.* Thus, despite the classification, ATF imposed an effective (though, it promised, temporary) ban on that sale or interstate transfer of the Reformation.

In December 2019, ATF issued an open letter to the public reiterating that Franklin cannot sell the Reformation to customers who are not FFLs, and unlicensed individuals who own the Reformation cannot "lawfully transport the firearm across state lines." Am. Compl. Ex. O at 2, ECF No. 22-15. The open letter also asserted that the Reformation was "not a shotgun as defined in the NFA" "because the Reformation is not chambered for shotgun shells." *Id.* at 1. The open letter again represented that "ATF is currently developing the procedures and forms" to "provide

the mechanism necessary for FFL holders and owners of [GCA-only] firearms to request the statutorily required approvals." *Id.* at 2. Finally, the letter represented that "ATF is currently developing the procedures and forms" to "provide the mechanism necessary for FFL holders and owners of [GCA-only] firearms to request the statutorily required approvals." *Id.* at 2. Yet years continued to pass without the agency issuing the procedures it promised.

On January 4, 2023—some *1,513* days after ATF classified the Reformation as a GCA-only short-barreled shotgun—Plaintiffs initiated the present suit. Plaintiffs sought mandamus relief to force ATF to deliver on its promise to create mechanisms for selling and transferring the Reformation. Plaintiffs additionally requested a ruling that the agency's enforcement policy regarding the Reformation, as well as its classification of the Antithesis, were arbitrary and capricious. In response to the litigation, on March 9, 2023, ATF asked that Plaintiffs allow the agency additional time to respond to the Complaint, representing that "ATF is considering the relief plaintiffs requested regarding the Reformation firearm, and that may have bearing on the litigation." Defs.' Unopposed Mot. for Extension of Time, ECF. No. 6, at 1. Plaintiffs agreed to the extension, encouraged by the agency's suggestion that it was finally considering remedying the gap in the federal firearm regulations that prevented Franklin from selling the Reformation.

Instead of issuing forms and procedures, however, ATF chose further delay, filing a motion to dismiss contending that this Court lacked both venue and jurisdiction. Defs.' Mot. to Dismiss, ECF No. 8. The motion, as Plaintiffs would argue, relied almost exclusively on objectively incorrect information. For example, ATF speculated that FRAC's headquarters was not located in Bismarck—something Plaintiffs easily disproved in their response to ATF's motion. *See* Gov. First MTD at 1. Plaintiffs additionally filed a motion for summary judgment with their opposition to the motion to dismiss seeking a decision on the merits.

Rather than choosing to defend its ban of the Reformation, on May 4, 2023—four months after Plaintiffs initiated this suit and four-and-a-half years after initially classifying the Reformation—ATF reclassified the Reformation "as a 'shotgun' under both the GCA *and the NFA*." Am. Compl. Ex. Q at 1. Although ATF acknowledged that it had previously classified "the Reformation firearms as 'shotguns' under the [GCA], but not as 'shotguns' under the [NFA]," *id.* at 2, ATF explained that it had done so because the Reformation is "chambered for .300 BLK, which is a traditional fixed metallic cartridge that FTISB did not consider a traditional 'fixed shotgun shell,'" *id.* at 3. Reclassification was necessary, ATF explained, because the agency wanted to create a "searchable database that maintains records of any [GCA] approval" for the sale, delivery, or interstate transfer of the Reformation, and it questioned its authority to "maintain[] such a system of records outside the structure of the NFA." *Id.*

ATF's post-hoc reclassification of the Reformation lacks any legal justification, having been undertaken for the purpose of frustrating Franklin's ability to sell what ATF considers to be a GCA-only weapon rather than to apply the GCA and NFA faithfully. And the agency's continued refusal to issue forms and identify procedures for selling or transferring the Reformation results in an effective ban on the otherwise lawful sale of GCA-only short-barreled shotguns to the American public. ATF's machinations over the course of more than **four years** have been extremely prejudicial to Franklin—costing the company millions of dollars in lost revenue and cutting into Franklin's patent-protected period to market the Reformation, *see* 35 U.S.C. § 154(a)(2).

### B. ATF's Misclassification Of The FAI-15 Antithesis.

In March 2020, Plaintiff Franklin Armory ("Franklin") requested voluntary classification of an FAI-15 equipped with a novel barrel called the Antithesis. *See* Am. Compl. Ex. B, ECF No. 22-2. The Antithesis is designed primarily for hunting and, as such, has a rifled barrel that "is

chambered in, and designed to accept, both .410 bore shotshells and 45 Long Colt cartridges." *Id.*

at 3; *see* Am. Compl. ¶¶ 86–87.  In other words, the Antithesis can fire both shotgun shells with

multiple projectiles and fixed cartridges with a single projectile.  For that reason, Franklin

inscribed ".410/.45LC" on the FAI-15 Antithesis to indicate that the weapon fires both types of

ammunition.  Am. Compl. Ex. B at 3.  Franklin explained to ATF that it successfully tested .410

bore shotshells and 45 Long Colt cartridges with the weapon.  *Id.*  Franklin observed that the

weapon "had great results cycling the action using [those two] loads."  *Id.*

In subsequent correspondence, Franklin also explained that a firearm equipped with the

Antithesis is not a "rifle" under the GCA or the NFA because it is not designed "to fire only a

single projectile."  Am. Compl. Ex. C at 1–2, ECF No. 22-3.  Rather, an Antithesis-equipped

firearm is "designed and intended to fire shot," which consists of multiple projectiles.  *See id.* at

2.  And Franklin explained that the "rifling's effect of rapidly increasing the spread of the resulting

[shot] pattern is desirable in certain hunting situations such as unexpected close range turkey

hunting shots and close shots in thick cover at fast fleeting gamebirds."  Am. Compl. Ex. D at 4,

ECF No. 22-4 ("Antithesis 2020 Explanation Letter").  Franklin also explained that "projectile

stabilization is not a necessary attribute" in "comparatively short-range engagements."  Am.

Compl. Ex. B at 2.  Franklin noted that three commercially successful handguns utilized designs

that "fire[d] singular projectiles as well as ball shot through a rifled bore," *id.*, and are being used

by bird hunters, Am. Compl. Ex. D at 4.

In December 2021, ATF classified the FAI-15 Antithesis as a short-barreled rifle.  *See* Am.

Compl. Ex. F, ECF No. 22-6 ("FAI-15 Antithesis Classification Letter").  ATF found that the FAI-

15 Antithesis's "barrel extension and . . . barrel breech are fit and chambered to accept the .45 Colt

and .410 Bore cartridges."  *Id.* at 3.  ATF acknowledged that Franklin "state[d] [that] the firearm

is 'designed and intended to fire shot and slugs from .410 bore shotshells and singular projectiles from .45 Long Colt.'" *Id.* at 4 (emphasis omitted). And ATF did not dispute that the FAI-15 Antithesis in fact fires shot using .410 shotshells. *See id.* But ATF still found that the FAI-15 Antithesis was not designed to fire shotshells. *See id.*

To reach this counterintuitive result, ATF declared that "a rifled bore is an objective design feature designed and made to fire only a single projectile." *Id.* ATF apparently based this conclusion on its opinion that a "rifled bore is disadvantageous as an objective design feature when using shot ammunition, as the twist of the shot column traveling down the bore will spread the shot pattern." *Id.* ATF thus reasoned that even though the FAI-15 Antithesis fires shot, it was necessarily designed to fire only a single projectile because it utilizes a rifled bore. *See id.*

## ARGUMENT

"[W]hen a party seeks review of agency action under the APA, the district court sits as an appellate tribunal" because "[t]he entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations and quotations omitted). The APA authorizes courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "[U]nder this standard, an agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Grace Healthcare of Benton v. HHS*, 603 F.3d 412, 422 (8th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). ATF's classification decisions regarding the Reformation and the FAI-15 Antithesis, as well as its failure to promulgate procedures to transfer GCA-only weapons such that it has effectively banned such transfers, violate the APA.

# I. THE COURT SHOULD GRANT PLAINTIFFS SUMMARY JUDGMENT ON THE REFORMATION COUNTS

At every turn, ATF's strategy has been to undermine the ability of Franklin to offer the Reformation—a weapon for which there is tremendous public demand—for sale to the American people. *First*, ATF unlawfully classified the Reformation as a GCA-only short-barreled shotgun, contrary to that statute's definition of "shotgun." *Second*, the agency refused to endorse procedures to allow for its transfer, which effectively banned the weapon. *Third*, when faced with the present lawsuit, ATF reclassified the Reformation as both a GCA *and* NFA short-barreled shotgun—a decision unreconcilable with the statutory text of either law. Because ATF's treatment of the Reformation violates the APA, Plaintiffs deserve relief.

## A. ATF's Classification Of The Reformation Was Unlawful.

ATF's most recent classification decision determined that the Reformation is both a GCA and NFA short-barreled shotgun. Neither statute can support such a designation.

### 1. The Reformation Is Neither An NFA Nor GCA Short-Barreled Shotgun Because It Does Not Have A Smooth Bore.

The Reformation is not a shotgun under either the NFA or GCA because those statutes define "shotgun" as a weapon that "fire[s] through a smooth bore," 18 U.S.C. § 921(a)(5); 26 U.S.C. § 5845(d), and the Reformation does not have a smooth bore. Rather, its bore has lands and grooves (*i.e.*, ridges). A bore that has lands and grooves is not "smooth." ATF reached the contrary conclusion—that unsmooth can mean smooth—by citing only one source, picking the wrong source for its one citation, blue-penciling the statute, and committing logical fallacy. ATF's interpretation disregards plain meaning and must be vacated.

ATF concluded that "smooth" means "not rifled," but it provided no authority or reasoning for that contrived interpretation other than citing a single definition from a single "[o]nline [d]ictionary," Am. Compl. Ex. L at 4, and that sole citation is riddled with problems. As an initial

matter, an online dictionary that reflects modern meaning is the wrong place to look for evidence of a 1934 statutory term's meaning. Because "every statute's meaning is fixed at the time of enactment," *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018) (emphasis omitted), whatever a term "might call to mind" when heard by "ears today" makes no difference because "modern intuition" is irrelevant, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). It is "contemporaneous editions" of dictionaries that an interpreter should consult, *Reves v. Ernst & Young*, 494 U.S. 56, 77 (1990), not modern dictionaries.

The defined word ATF cited, moreover, does not appear in the NFA or GCA. ATF cited a definition of "smoothbore," which is a single word that can be used as an adjective ("he bought a smoothbore weapon") or noun ("he bought a smoothbore"). But the NFA and GCA do not use that word—rather, they define shotgun as a weapon that "fire[s] through a smooth bore." ATF proceeded as if the statutes use "smoothbore" and treated the actual statutory language as differing merely in "spell[ing]." Am. Compl. Ex. L at 4.

But tinkering with statutory language is impermissible no matter how subtle, and ATF's revision is no mere spelling discrepancy. A statute that taxes certain fruits including those that are "a blue berry" imposes a tax on berries that are blue, and an interpretation resting on a definition of "blueberry" will have changed the statute's meaning. "[F]ires through a smooth bore" is no different. In the actual statutes, "smooth bore" is not a single-word adjective (that modifies something else) or noun (that stands by itself). Rather, "smooth" is an adjective that modifies the separate word "bore." In other words, "smooth" is the kind of bore that a shotgun "fire[s] through." *See Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1788 (2022) ("[Statutory] words must be read and interpreted in their context, not in isolation." (internal quotation marks omitted)). By treating "smooth bore" as a single compound word instead of an adjective followed by a noun it modifies,

ATF obscured the statutes' meaning.

Indeed, the hypothetical invocation of a "blueberry" definition is not nearly as bad as ATF's reasoning here. Perhaps the fruit-tax statute contains a scrivener's error, and the legislature actually meant to limit its tax to blueberries—a statutory provision that taxes certain fruits including "blueberries" certainly makes semantic sense. By contrast, inserting ATF's defined word "smoothbore" into the NFA and GCA—such that they read " . . . fire[s] through a smoothbore"—renders the statutes semantically nonsensical. In that sentence "smoothbore" is used as a noun, and the noun smoothbore is a ***weapon***, not a bore. *See, e.g.*, The Century Dictionary ("*n.* A firearm with a smooth-bored barrel."). The NFA and GCA obviously do not mean to define shotgun—itself "a weapon," the statutes say—as something that "use[s] the energy of an explosive to fire through a [certain kind of weapon]." Instead, they much more sensibly identify the kind of ***bore*** a shotgun fires through.

When ATF's interpretive mistakes are corrected, it is evident that a weapon that "fire[s] through a smooth bore" is one that fires through a bore that is smooth. Enactment-era dictionaries establish that "smooth" meant then what it means now: "[h]aving a surface without irregularities; not rough;" "[h]aving no impediments or obstructions;" "[c]alm and unruffled." Funk & Wagnalls Comprehensive Standard Dictionary of the English Language (1934). The Reformation's bore plainly does not fit those descriptions. *See, e.g.*, *United States v. Spinner*, 152 F.3d 950, 958 (D.C. Cir. 1998) (government represented that "[the] jury simply could have looked down the barrel of the weapon … and determined on its own whether the bore was smooth"). Because the Reformation's bore is not smooth, it cannot be classified as a shotgun under the NFA or GCA.

The meaning of the compound word "smoothbore," to the extent it is relevant, only reinforces that conclusion. One prominent enactment-era dictionary, for example, defined

smoothbore as "[h]aving a bore of smooth surface." Webster's New International Dictionary (1923). A smoothbore weapon, in other words, was a weapon with a bore that is smooth. No doubt, "a bore of smooth surface" was often "disting[uished] from *rifled* [bores]." *Id.*; *see also* The Century Dictionary (1914) ("[a] firearm with a smooth-bored barrel" stood in "contradistinction" to a "rifled gun" (italicization omitted)). Because the common way a bore could become unsmooth was through rifling, it was natural for dictionaries to reference the fact that a smoothbore has no rifling. *See* The Century Dictionary (defining "smooth-bored" as "[h]aving a smooth bore" and then further explaining that a smooth-bored weapon is "not rifled"). But it is Logic 101 that A→~B (if rifled then not smooth) and B→~A (if smooth then not rifled) do not imply ~B→A (if not smooth then rifled). And the contingent fact that most all bores ***in existence*** at the time were either smooth or rifled does not mean that the ***definitional*** universe of bores consisted solely of those that are smooth or rifled. A twentieth-century statutory reference to "automobiles" encompasses Teslas even though an automobile like a Tesla was only a theoretical possibility at the time, and that is because a Tesla fits the definition of an automobile. Forms of unsmooth boring other than rifling likewise fit the definition of an unsmooth bore even if they were uncommon or nonexistent in 1934 and 1968.

Congress "with ease could have drafted" the NFA and GCA to define shotgun as a weapon that fires through a bore that is not rifled, but "Congress did not write the statute that way." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995). And "Congress alone"—not ATF—holds the "constitutional authority to revise statutes in light of new social problems and preferences." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018). Under "the original meaning of the written law," *id.*, smooth means smooth and ATF's contrary conclusion must be vacated.

Finally, even if the meaning of "fires through a smooth bore" were unclear (and it is not),

the rule of lenity would foreclose ATF's reading. *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 (1992) (plurality) (applying rule of lenity when reviewing ATF classification decision under the NFA "in a civil setting"); *id.* at 519 (Scalia, Thomas, JJ., concurring) (same); *Cargill v. Garland*, 57 F.4th 447, 469–71 (5th Cir. 2023) (same); *Hardin v. ATF*, 65 F.4th 895, 901 (6th Cir. 2023) (same). The "rule of lenity . . . requires that ambiguities be resolved against the application of criminal penalties." *W. Virginia v. EPA*, No. 3:23-CV-032, 2023 WL 2914389, at *9 (D.N.D. Apr. 12, 2023) (Hovland, J.). Here, because the NFA and GCA carry criminal penalties, lenity requires resolving any contestable interpretive issue "in [Plaintiffs'] favor." *Hardin*, 65 F.4th at 898, 902.

## 2. The Reformation Is Not An NFA Short-Barreled Shotgun Because It Is Not Chambered For Shotgun Shells.

Weapons may be regulated under the NFA as shotguns only so long as they are "designed . . . and made . . . to use the energy of the explosive in a ***fixed shotgun shell*** to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger." 26 U.S.C. § 5845(d) (emphasis added). In its 2018 classification decision, ATF correctly declined to regulate the Reformation under the NFA. As the agency subsequently explained in an open letter to the public on December 19, 2019, "because the Reformation is not chambered for shotgun shells, it is not a shotgun as defined in the NFA." Am. Compl. Ex. O at 1.

That straightforward determination is clearly correct. It is uncontested that the Reformation is chambered for .300 BLK, which ATF acknowledges "is a traditional fixed metallic cartridge." Am. Compl. Ex. Q at 3. And a "cartridge," by definition, is not a "shotgun shell." While neither the GCA nor NFA provide express definitions of the terms "shotgun shell" and "cartridge," their meaning was well understood, as sources contemporaneous to the enactment of the GCA and the NFA's 1968 amendment make clear. For example, in 1974, *Popular Mechanic*

explained that a "[c]artridge" is a "[c]omplete unit consisting of brass shell casing that holds primer which, when struck by gun's firing pin, explodes and ignites powder, drives out bullet." Tom Faulkner, "How to Choose the Best Cartridge," *Popular Mechanics*, Vol. 142, No. 6, at 110 (Dec. 1974). A "[s]hotgun shell," by contrast, is "[s]imilar to cartridge but has brass or steel base and body of paper or plastic. Ahead of primer and powder is projectile of many small pellets or single large 'rifled slug' completely encased in shell." *Id.*; *see also, e.g.*, *It's High Time Somebody Nailed Down the Truth About Ammunition* (Advertisement), Field & Stream, Oct. 1970, at 2 ("There are five basic ingredients in a shotgun shell—the shell, wad column, the primer, the shot and the powder.").

Indeed, ATF readily acknowledged that contemporaneous sources confirm that the Reformation's ammunition would not have been considered a "shotgun shell," as that term is used in the NFA. *See* Am. Compl. Ex. O at 5. For example, ATF notes that the *Shooter's Bible Small Arms Lexicon and Concise Encyclopedia*, published in 1968, defined "cartridge" to mean "such rounds used in small arms **other than shotguns**." *Id.* (quoting Chester Mueller and John Olson, *Small Arms Lexicon and Concise Encyclopedia*, 44 (1st ed. 1968)) (emphasis added). A "shotgun shell," by contrast, is a "fixed round of ammunition designed for use in a shotgun. It consists of a paper or plastic body, a thin brass head at one end, a battery cup primer, base wad, powder charge . . . and folded crimp." *Id.*

A straightforward application of these terms led ATF to decide against classifying the Reformation as an NFA shotgun in 2018. The NFA definition of "shotgun" simply could not apply to the Reformation, because it "is not chambered for shotgun shells." Am. Compl. Ex. O at 1. Yet ATF has suddenly chosen to reverse course, claiming that the Reformation now *can* qualify as an NFA shotgun. In doing so, ATF argues that it may ignore the term "fixed shotgun shell," as used

in the NFA, 26 U.S.C. § 5845(d), because "there is no readily discernable statutory definition of a '*fixed shotgun shell*,' nor practical discernable difference between the components of a 'cartridge' and 'shotgun shell.'" Am. Compl. Ex. Q at 6. ATF goes on to conclude that "Congress used the term 'fixed shotgun shell' merely as shorthand for the expulsion of projectiles (whether in the form of multiple metallic shot or a single projectile) from a smooth bore weapon." *Id.* But again, such a conclusion disregards contemporary sources, which clearly distinguish the terms—indeed, sources that ATF itself previously relied upon.

More significantly, conflating the terms "shotgun shell" and "cartridge" cannot be squared with the plain text of the statute itself. Stripping the term "shotgun shell" of any distinct meaning beyond "projectiles . . . [fired] from a smooth bore weapon," *id.*, as ATF now advocates, results in a tautology: A firearm is a shotgun when it uses a "fixed shotgun shell," and ammunition is a "fixed shotgun shell" when it is inserted into a shotgun. Virtually every GCA shotgun, therefore, would necessarily be an NFA shotgun. But that clearly cannot be the case. While Congress added the ammunition distinctions in the NFA definitions of "shotgun" and "rifle" through the same act in which it adopted the definitions in the GCA, *see* Pub. L. No. 90-618, §§ 102, 201, 82 Stat. 1213, 1215, 1231 (1968), it subsequently removed the ammunition distinctions from only the GCA, *see* Pub. L. No. 105-277, § 115, 112 Stat. 2681, 2681–490 (1998).[5] As a result, the inclusion of the term "shotgun shell" is what primarily sets the NFA's definition apart from the GCA's definition of "shotgun." *Compare* 26 U.S.C. § 5845(d) (NFA) *with* 18 U.S.C. § 921(a)(5) (GCA).

---

[5] ATF contends that Congress's decision to amend the GCA was motivated by a desire to reconcile the GCA's definitions for "shotgun" and "rifle" with its definition for "antique firearm" in 1998. Am. Compl., Ex. Q at 7. Perhaps, but that does not explain how Congress's elimination of "shotgun shell" from the GCA could possibly call into question Congress's decision to include that term in the NFA ***thirty years earlier***. The fact remains that "shotgun shell" is still in the NFA's definition for shotgun, and only Congress can choose to eliminate it.

"When Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citation omitted). Simply ignoring the term "shotgun shell," as ATF now advocates, would violate the rule to "give effect, if possible, to every clause and word of a statute." *United States v. Pulsifer*, 39 F.4th 1018, 1021 (8th Cir. 2022) (citations and quotations omitted); *see City of Chicago, Illinois v. Fulton*, 141 S. Ct. 585, 591 (2021); *Duncan v. Walker*, 533 U.S. 167, 167 (2001) ("This Court's duty to give effect, where possible, to every word of a statute, . . . makes the Court reluctant to treat statutory terms as surplusage."); *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed."); *Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("Affirmative words are often, in their operation, negative of other objects than those affirmed; and in this case, a negative or exclusive sense must be given to them or they have no operation at all.").

Reading the NFA without reference to the GCA leads to the same conclusion: Congress intended the terms "shotgun shell" and "cartridge" to be distinct. For example, Congress was clear when it chose to reference *both* "fixed cartridges" and "fixed shotgun shells" because it used the broader term "fixed ammunition" in other definitions in the same section of the NFA. *See, e.g.*, 26 U.S.C. § 5845(g) (defining "[a]ntique firearm"). And in defining the term "any other weapon"—which appears immediately after the definition of "shotgun"—the NFA uses both the terms "fixed shotgun shell" and "fixed ammunition." 26 U.S.C. § 5845(e). Reading these terms to be "interchangeable," as ATF advocates, Am. Compl. Ex. Q at 7, would violate the presumption that when a legal text "use[s] one term in one place, and a materially different term in another," "the different term denotes a different idea." Antonin Scalia & Bryan A. Garner, *Reading Law:*

*The Interpretation of Legal Texts* 170 (2012); *see also* William N. Eskridge Jr., *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 109–10 (2016) (same); *id.* at 110 n.58 (collecting Supreme Court cases).

Given these insurmountable textual difficulties with ATF's construction of the NFA, the agency attempted to buttress its interpretation by appealing to a supposed broader "purpose" for the statute, arguing that advancing such purpose is license to disregard individual terms like "shotgun shell." According to ATF, Congress enacted the NFA to regulate weapons that it believed "pose[d] a significant crime problem because of their frequent use in crime, particularly the gangland crimes of that era such as the St. Valentine's Day Massacre." Am. Compl., Ex. Q at 7. Thus, although a plain reading of the NFA's definition of "shotgun" might exclude regulating weapons like the Reformation that are not chambered for shotgun shells, "reading a single, isolated provision of the NFA in such a narrow manner undermines the overall structure of the NFA." Am. Compl., Ex. Q at 7. That is to say, ATF believes that because Congress supposedly would have wanted the federal government to regulate weapons like the Reformation, ATF should be permitted to do so—regardless of what 26 U.S.C. § 5845(d) actually says.

While a statute's supposed overall purpose may be helpful in construing its language, extratextual evidence cannot override the plain meaning of the words Congress chose to include. In fact, ATF gets the interpretive process backwards: Statutory purpose should be gleaned primarily not from extraneous sources, but from the text itself. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose"). As ATF (correctly) concluded initially, the text of 26 U.S.C. § 5845(d) precludes ATF from regulating weapons like the Reformation. *See* Am. Compl. Ex. O

at 1 ("[B]ecause the Reformation is not chambered for shotgun shells, it is not a shotgun as defined in the NFA"). A supposed broad Congressional purpose of fighting "gangland crimes" is not license to rewrite the NFA to authorize ATF to regulate whatever firearm it so desires. *See Kloeckner v. Solis*, 568 U.S. 41, 55 n.4 (2012) ("[E]ven the most formidable argument concerning the statute's purposes could not overcome the clarity we find in the statute's text.").

Indeed, much of ATF's reasoning concerning purpose fails to comport with reality. For example, ATF declares that adopting a straightforward reading of the term "shotgun shell" would contravene Congressional purpose because it would improperly "focus not on the design of the firearm itself, but the design of the projectile used therein." Am. Compl. Ex. Q at 7. But it would be nonsensical to assume that Congress placed no importance on the type of ammunition for which a particular weapon was chambered. Surely Congress did not intend to regulate a weapon capable of firing exclusively confetti under the NFA.

ATF's desire to override the statutory text is especially concerning given how weak ATF's evidence is for a supposed Congressional purpose. ATF purports to identify the NFA's intent based on its own claim that "legislative history of the law discloses [that] its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." *See ATF National Firearms Act Handbook—Introduction*, at 1 (Rev. 2009), https://www.atf.gov/firearms/docs/undefined/atf-national-firearms-act-handbook-introduction (cited in Am. Compl. Ex. Q at 7). But aside from the fact that ATF fails to cite any actual legislative history in support, an intent to curtail "transactions in NFA firearms" says nothing about ***what*** qualifies as "NFA firearms." ATF's reasoning is thus circular. Plain text should always control, but an agency certainly cannot use "ambiguous legislative history to muddy clear statutory language." *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011).

Even if the statutory definition were ambiguous—though it is not—the rule of lenity would compel the same outcome. As explained above, lenity requires construing any ambiguity in the NFA and GCA to avoid placing products within the ambit of those criminal statutes. *See, e.g.*, *Thompson/Ctr. Arms Co.*, 504 U.S. at 517–19. Here, the definition of "shotgun shell" unambiguously excludes cartridges like the .300 BLK. But even if it did not, Plaintiffs' interpretation is at minimum "reasonable," and where the NFA and GCA are "subject to more than one reasonable interpretation," they are "ambiguous," and lenity requires "constru[ing] the statute in [Plaintiffs'] favor." *Hardin*, 65 F.4th at 898, 902.

"ATF's own flip-flop in its position" further confirms that the rule of lenity should apply. *Id.* at 898; *see also Cargill*, 57 F.4th at 469 (applying rule of lenity where "the Government has construed the same statute in two, inconsistent ways at different points in time"). Indeed, the statutory definition of "shotgun shell" "hasn't changed, only [the] agency's interpretation of it." *Guedes v. ATF*, 140 S. Ct. 789, 790 (2020) (statement of Gorsuch, J.). That Plaintiffs are pressing the same interpretation that the agency itself pressed for years confirms the "viability of [the] competing interpretation[]" and thus ambiguity. *Hardin*, 65 F.4th at 898. Thus, at minimum, lenity demands that the 2023 classification decision be set aside.

Finally, even if ATF had a defensible statutory argument (it does not), the illogical reasoning contained within its 2023 classification would nevertheless render its decision arbitrary and capricious. In justifying its decision to reclassify the Reformation as an NFA shotgun, ATF explained that it "wanted to create a 'searchable database that maintains records of any [GCA] approval' for the sale, delivery, or interstate transfer of GCA-only short-barreled shotguns, and it questioned its authority to 'maintain[] such a system of records outside the structure of the NFA.'" Am. Compl. Ex. Q at 3. Unlike the NFA, the GCA does not require the agency to create a

searchable database that maintains records of GCA-only short-barreled shotguns; instead, it requires only that the Attorney General "specifically authorize[]" the sale, delivery, or interstate transfer of such weapons. 18 U.S.C. § 922(a)(4), (b)(4). In fact, Congress has indicated that ATF **should not** maintain such database for GCA-only weapons, *see, e.g.*, *id.* § 926(a)[6]—a point Franklin raised previously in meetings with the agency.

And ultimately, this is the point. ATF decided that the Reformation is now an NFA weapon not because it is covered by the statute, but rather because the agency wanted to use the NFA's monitoring authority to cover GCA-only weapons as well. Judicial review of agency action "requires that the grounds upon which the . . . agency acted be clearly disclosed." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 94 (1943). And "[a]n agency changing its course . . . is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983).

Here, the agency's sham statutory interpretation was a mere afterthought designed to accomplish a completely separate goal—regulating transfers of GCA-only weapons—that has nothing to do with the statutory text. As such, the agency failed to comply with its obligation to "disclose the basis of" the decision, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962), as well as its duty to supply sufficient reasoning justifying the change in policy, *see State Farm*, 463 U.S. at 30. According to ATF, Congress could not possibly have meant what

---

[6] "No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the [Attorney General's] authority to inquire into the disposition of any firearm in the course of a criminal investigation."

it said, because it surely must have wanted ATF to be able to create a database: "The lack of a viable GCA procedure, and concerns about the new collection of firearm owner information under the GCA not associated with a tax filing under the NFA, . . . raises the issue of whether Congress intended there to be 'short-barreled shotguns' regulated solely under the GCA, and not subject to the registration and transfer requirements of the NFA." Am. Compl. Ex. Q at 3. But in reality, rather than abiding by the consequences of *Congress's* policy choices, ATF decided to "revisit[] the relevant definitions" and come to a different conclusion that allowed it to accomplish *its own* policy objectives. *Id.* at 3–4. Instead of undertaking a straightforward reading of the text, the agency's warped construction of the NFA was merely a pretext for bypassing Congress's prohibition on the creation of a database.

At bottom, the agency is bound by the text of the statute, and here that text definitively forecloses regulating the Reformation under the NFA. ATF was correct on this point in its original classification, and nothing has changed since 2018 to undermine that determination.

### B. ATF Has Unlawfully Delayed Promulgation Of Procedures For GCA-Only Short-Barreled Shotguns.

The APA provides that a reviewing court "shall" "compel agency action . . . unreasonably delayed." 5 U.S.C. § 706. While there is "no per se rule as to how long is too long," a "reasonable time for agency action is typically counted in weeks or months, not years." *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 274 (D.C. Cir. 2020) (cleaned). Here, despite recognizing that promulgating procedures for authorization of GCA-only short-barreled weapons was "necessary," Am. Compl. Ex. O at 2, ATF has delayed more than *four years* and counting. ATF has never given any reason to think these procedures—which already exist for other weapons—should take *one* year to promulgate, let alone *four*. ATF's delay effectively bans an entire class of lawful products and potential products without authority. The Court should put a stop to ATF's

surreptitious ban and compel ATF to act.

The Eighth Circuit "evaluate[s] the reasonableness of delay" by examining six factors outlined in the D.C. Circuit's *Telecommunications Research & Action Center v. FCC ("TRAC")* decision. *Irshad v. Johnson*, 754 F.3d 604, 607 (8th Cir. 2014) (citing 750 F.2d 70, 80 (D.C. Cir. 1984)). Under that approach, "[t]ime is the first and most important factor." *Pub. Emps. For Env't Resp.*, 957 F.3d at 273–74 (cleaned). And this most important factor strongly favors a finding of unreasonable delay here.

Agency action ordinarily should take only weeks or months. *Id.* at 273; *see also, e.g.*, *Han Cao v. Upchurch*, 496 F. Supp. 2d 569, 577 (E.D. Pa. 2007) (four-year delay presumptively unreasonable); *Liu v. Chertoff*, No. CV–06–1682–ST, 2007 WL 2435157, at *11 (D. Or. Aug. 29, 2007) (three-year delay unreasonable); *Elkhatib v. Butler*, No. 04–22407–CIV-SEITZ, 2005 WL 5226742, at *2 (S.D. Fla. June 7, 2005) (four-year delay unreasonable). And ATF has offered no reason that the action required here need take unusually long. To the contrary, the action here should require substantially *less* time than most because it does not involve "analysis of complex, sensitive factors," *Irshad*, 754 F.3d at 607, or require "extensive efforts" on "subjects of [high] complexity," *Org. for Competitive Mkts. v. USDA*, 912 F.3d 455, 463 (8th Cir. 2018); *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003) (unreasonable-delay issue "depend[s] in large part . . . upon the complexity of the task at hand"); *id.* at 1100 (agency delay attributable to "a shortage of resources addressed to an extremely complex and labor-intensive task"). Rather, it merely requires ATF to promulgate procedures for manufacturers to seek authorization for GCA-only short-barreled shotguns—procedures that already exist for other, more heavily-regulated NFA weapons. ATF has offered no reason it could not complete the action within four years given the substantial "resources available to the agency,"

*Mashpee Wampanoag Tribal Council*, 336 F.3d at 1102, let alone why it continues to delay its decision despite representing to Plaintiffs shortly before its surprise reclassification of the Reformation that a decision was imminent.

Eighth Circuit cases upholding agency delay in other circumstances highlight the absence of justification for delay here. For example, in *Irshad v. Johnson*, the plaintiff challenged a delay in an agency decision on whether to grant an exemption from terrorism-related inadmissibility provisions of federal immigration law. 754 F.3d at 605. The Court asserted that the government "has a strong interest in completing the exemption process in terrorism-related cases with great care." *Id.* at 608. It further explained that the agency decision involved "sensitive factors that implicate national security, foreign policy, and humanitarian interests." *Id*. at 607. And it had been only recent "[c]hanges in law and policy" that gave the agency "discretion . . . to grant [the plaintiff] relief that otherwise would be unavailable to him." *Id.* at 608. Similarly, in *Organization for Competitive Markets v. USDA*, the agency "made extensive efforts to comply" with the statutory timeframe by "promulgating three final regulations and a proposed [fourth] regulation," and those efforts "[a]rguably . . . [placed the agency in] full compliance with the [statute]." 912 F.3d at 463. Thus, it would have been "unreasonable" to expect the agency to act any faster. *Id.* In this case, on the other hand, the agency need only create a new version of an existing form so that it applies to a new regulatory category. The contrast is obvious.

The other *TRAC* factors also support a finding that ATF's delay is unreasonable. Because Congress has not "provided a timetable" in any substantive statute that would permit a four-year delay in promulgating a basic procedure, *TRAC*, 750 F.2d at 80 (second factor), the APA's directive applies: "each agency shall proceed to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b); *see also Al-Rifahe v. Mayorkas*, 776 F. Supp. 2d 927, 936

(D. Minn. 2011) ("With regard to the first and second *TRAC* factors, the APA's general reasonableness standard applies in the absence of an explicit timeline in the relevant statutes."). As explained, ATF has not concluded the matter within a reasonable time.

The Court, moreover, "should also take into account the nature and extent of the interests prejudiced by delay," recognizing that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *TRAC*, 750 F.2d at 80 (third and fifth factors). This is important because different kinds of delays carry different implications. A delay in adjudicating a claim for benefits, for example, may deprive a person of money for a period of time, but that deprivation ultimately can be remedied with interest. A delay in promulgating a rule may merely preclude certainty about the prospective regulatory landscape.

By contrast, by imposing a *de facto* ban on the sale and transfer of a lawful product and potential products, the delay here is far more prejudicial because it is irreparable, severe, and concerns human health and welfare. The delay has harmed the American public by depriving it of the ability to buy, receive, and transport firearms that are useful for hunting, home defense, and recreational shooting. The firearms industry—which FRAC represents—has been prejudiced, too, because it is unable to sell and deliver to unlicensed individuals—the vast majority of customers— a popular class of firearms.

Franklin, for its part, has lost millions of dollars because of ATF's delay. In the years since ATF took the position that FFL holders may not lawfully transfer the Reformation to a non-licensee, Franklin has not been able to sell the Reformation. Am. Compl. Ex. A ¶¶ 31–44, ECF No. 22-1. Franklin already has produced 1,195 barrels designed to be affixed to the Reformation that it has not been able to sell, and those alone are worth more than one million dollars. *Id*. ¶ 42– 44. And demand for the Reformation is high. Indeed, the National Association of Sporting Goods

Wholesalers and the Professional Outdoor Media Association named the Reformation the "Best New Shotgun" of 2019. *See* Press Release, National Association of Sporting Goods Wholesalers & Professional Outdoor Media Association, NASGW Announces Award Winners at the 2019 NASGW Expo (Oct. 24, 2019), https://tinyurl.com/2hxpnp7a.[7] Franklin estimates that it would make $8 million in firearm sales after just the first year of producing the Reformation. *See* Am. Compl. Ex. A ¶¶ 46, 51, Am. Compl. Ex. P at 15 (Franklin Presentation to ATF (Aug. 1, 2018)). And after the first five years, Franklin estimates that it would make $25 million in firearms sales per year. *See* Am. Compl. Ex. A ¶¶ 47, 51; Am. Compl. Ex. P at 15. Franklin estimates that it also would sell one million rounds of ammunition for the Reformation in the first year of production, and ten million rounds per year after the first five years. *See* Am. Compl. Ex. A ¶¶ 48, 49, 51; Am. Compl. Ex. P at 15, ECF No. 22-16. In addition, Franklin's patent for the exclusive right to utilize the Reformation's straight lands and grooves design (Patent No. 10,295,290) is time-limited, *see* 35 U.S.C. § 154(a)(2), and every day ATF delays cuts into Franklin's patent-protected period to market the Reformation.

Nor does ATF's reclassification of the Reformation as both a GCA and NFA shotgun eliminate the harm inflicted on Plaintiffs. Absent issuance of forms and procedures for GCA-only firearms, Franklin will find itself precisely back where it started if this Court sets aside the agency's decision classifying the Reformation as an NFA shotgun but upholds ATF's GCA decision (which it should not do) or if ATF voluntarily reclassifies. That is to say, relief is still needed because in

---

[7] The National Association of Sporting Goods Wholesalers is an influential trade association comprised of the largest firearms distributors in the United States. *See Our Association*, National Association of Sporting Goods Wholesalers, tinyurl.com/272heaev (last visited June 26, 2023). The Professional Outdoor Media Association is an influential outdoor sporting association. *See Why Join POMA?*, Professional Outdoor Media Association, tinyurl.com/37tw8fzs (last visited June 26, 2023).

the event that the Reformation reverts to a GCA-only firearm, ATF will immediately resume its effective ban on the weapon.

The Supreme Court made this point clear in *Parents Involved in Community Schools v. Seattle School District No. 1* ("*PICS*"), a case addressing the permissibility of a race-based student assignment policy. *See* 551 U.S. 701, 719 (2007). Defendant in that case, a Seattle school district, argued that plaintiff-students lacked standing to challenge the use of race as a metric because the school district had ceased using it after litigation commenced. *See id.* Notably, however, the school district never disavowed the permissibility of its policy and in fact continued to defend the constitutionality of using race as a factor in determining in which schools to place students. *See id.* As the Supreme Court explained in rejecting the school district's argument that plaintiff lacked standing to challenge reliance on race, "[v]oluntary cessation does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,' . . . a heavy burden that Seattle has clearly not met." *Id.* at 719 (quoting *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189, (2000)); *see W. Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (refusing to find moot challenge to action by federal agency where agency voluntarily ceased challenged conduct); *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (voluntary cessation of conduct did not moot controversy because "defendant is free to return to his old ways" and a decision on the merits would further "a public interest in having the legality of the practices settled").

Here, as in *PICS*, ATF has never disavowed its refusal to create forms and procedures for transferring GCA-only shotguns. Thus, such harm would "'reasonably be expected to recur,'" *id.*, if this Court were to set aside the Reformation's NFA classification (or if ATF on its own reversed course). The issue of ATF's refusal to allow for the sale or transfer of lawful GCA-only firearms

therefore very much remains a live controversy.

Moreover, even beyond the Reformation, ATF's ongoing delay continues to impose an effective ban on an entire class of weapons. The industry takes note of ATF's treatment of fellow manufacturers—especially when agency policy concerns a weapon as popular and innovative as the Reformation. In blocking the ability of anyone from selling or transferring GCA-only shotguns to non-FFL holders, ATF is sending a clear and deliberate message: There is no point to developing anything resembling the Reformation, because the agency will ensure that there is no realistic process through which to legally sell it. Franklin and its fellow FRAC members therefore continue to be harmed as a result of ATF's inaction because they are prevented from investing time and resources into developing popular weapons for fear that they may be classified as GCA-only firearms and therefore banned.

Turning to the fourth *TRAC* factor, compelling ATF to act would not negatively impact any "higher or competing priority." *TRAC*, 750 F.2d at 80. To the contrary, the action ATF is required to take—issuing a form on which individuals can explain why the transaction in question is consistent with necessity and public safety—would not require significant time or resources. And by now, ATF has had more than four years to focus on other priorities. ATF has never suggested that any competing priority has prevented it from acting on GCA-only authorization procedure. Indeed, ATF has undertaken significantly more burdensome actions in a fraction of the time it has delayed here. For example, it took ATF less than a quarter of the time to tackle the significantly more ambitious policy initiative of designing rules to regulate so-called "ghost guns": On April 8, 2021, the Attorney General instructed ATF to "close a regulatory loophole that has contributed to the proliferation of the so-called ghost guns," Merrick B. Garland, Attorney General, Remarks on Gun Violence Prevention at the White House Rose Garden (Apr. 8, 2021), and on

April 26, 2022, ATF issued a final rule promulgating regulations for these weapons, *see* 87 Fed. Reg. 24,652. It took ATF approximately one year, therefore, to close a perceived regulatory gap through a complex rule that amended more than a dozen federal regulations. ATF's delay here—more than four years to issue a single form—is inexplicable and unjustifiable by comparison.

Finally, while the Court "need not 'find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed,'" *TRAC*, 750 F.2d at 80 (sixth factor), the Court could find a form of impropriety here because ATF's delay effectively prevents all sales, deliveries, and interstate transfers of GCA-only weapons. This *de facto* ban—accomplished not through lawful means but surreptitiously through delay—is contrary to the expressed will of Congress, which enacted a statute requiring ATF to provide a means for parties to seek "specific[] authoriz[ation]" to sell, deliver, or transport across state lines weapons classified as short-barreled shotguns under the GCA but not the NFA. *See* 18 U.S.C. § 922(a)(4), (b)(4). As ATF has recognized, the lack of such a mechanism has created a "gap in the federal firearm regulations." Am. Compl. Ex. N at 2.

Through its open letter, ATF committed to fulfilling its duty to close that gap when it told the public that it "is currently developing the procedures and forms to address this new type of firearm." Am. Compl. Ex. O at 2. That commitment "is binding" because it "speaks of what 'is' done or 'will' be done." *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1027–30, 1033 (8th Cir. 2003) (requiring agency to comply with its policy statement); *see also CropLife Am. v. EPA*, 329 F.3d 876, 881 (D.C. Cir. 2003) (agency press release was binding because it used "clear and unequivocal language"). ATF's abdication of this duty for more than four years flouts Congress's carefully defined firearm regulatory scheme and ATF's commitment in the open letter to issue the necessary forms and procedures. Because ATF represented to the Court on March 24 that it was

"considering the relief Plaintiffs requested regarding the Reformation" and "expect[ed] to reach a decision as to the Reformation within 45 to 60 days," Gov. First MTD at 3 n.1, the Court should require ATF to promulgate the necessary forms and procedures within 30 days of the Court's order.

### C. ATF's *De Facto* Ban On GCA-Only Short-Barreled Shotguns Is Arbitrary And Capricious.

Having taken more than four years to publish a single form, ATF's delay can only be understood as an intentional general enforcement policy in which GCA-only weapons are effectively prohibited because the agency does not offer a mechanism to sell, deliver, and transfer those weapons. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (courts "are not required to exhibit a naiveté from which ordinary citizens are free" (internal quotation marks omitted)). This policy of not allowing authorization requests for GCA-only weapons while facilitating such requests for more heavily regulated weapons (*i.e.*, those covered by both the GCA and the NFA) "is arbitrary and capricious" because the policy choices are "internally inconsistent." *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018). The policy is arbitrary and capricious also because ATF has never offered any explanation for it. *See State Farm*, 463 U.S. at 43 (agency must "articulate a satisfactory explanation for its [policy]"). And the policy is "not in accordance with law," 5 U.S.C. § 706(2)(A), because ATF is not empowered to ban weapons, *see* ATF, *ATF Myths*, tinyurl.com/msw9cwfv ("Myth: . . . ATF makes the gun laws . . . . False: Congress makes federal gun laws; ATF enforces them.") (last visited June 26, 2023). ATF's *de facto* ban on weapons classified as GCA-only short-barreled shotguns is therefore unlawful and should be set aside for this additional reason.

## II. THE COURT SHOULD GRANT PLAINTIFFS SUMMARY JUDGMENT ON THE FAI-15 ANTITHESIS COUNT

ATF's conclusion that the FAI-15 Antithesis is a "rifle" under federal statutory law is contrary to the statutory text, not supported by reasoned decision-making, and counter to the record

evidence.  More specifically, ATF (A) misapplies the statutory definition of "rifle," (B) ignores Franklin's marketing of the FAI-15 Antithesis, and (C) mischaracterizes its design.

### A.  ATF Misconstrued The Statutory Definition Of "Rifle."

The NFA and GCA define "rifle" as a weapon designed and made "to be fired from the shoulder and . . . use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."  18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c) (similar).  The definition thus contains three components: the weapon must be designed and made to (1) be fired from the shoulder; (2) fire only a single projectile per trigger pull; and (3) fire through a rifled bore.  Those components are necessary—not sufficient—conditions; if some but not all are true of a particular weapon, the weapon is not a rifle.

ATF disregarded the plain statutory text by collapsing the second and third conditions.  According to ATF, "a rifled bore is . . . made to fire only a single projectile."  FAI-15 Antithesis Classification Letter at 4.  But if a rifled bore were necessarily made to fire only a single projectile, Congress would have had no need to include the single-projectile component of the definition—it could have defined "rifle" simply as a shouldered weapon "fired through a rifled bore."  The definition does not stop there, and it is "a cardinal principle of statutory construction that we must give effect, if possible, to every clause and word of a statute."  *United States v. Pulsifer*, 39 F.4th 1018, 1021 (8th Cir. 2022).

A shouldered weapon is a rifle, therefore, only if it has a rifled bore **and** fires only single projectiles.  While the FAI-15 Antithesis's rifled bore is one characteristic shared with rifles, that does not make the weapon a rifle.  *See Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25–26 (D.D.C. 2014) (observing that the fact that "one object has [some] characteristics in common with some category may not be very helpful in determining whether the object in question belongs in that category" and that "[a] mouse is not an 'elephant' solely because it has . . . a tail, gray skin,

and four legs"). For that reason alone, ATF's decision on the FAI-15 Antithesis cannot stand.

Finally, to the extent there is any ambiguity in the NFA and GCA definition of "rifle"—though there is not—lenity requires construing the NFA and GCA in favor of Plaintiffs' interpretation. *Thompson/Ctr. Arms Co.*, 504 U.S. at 517–19; *accord supra* section I.A.

## B.     All Marketed Capabilities Are Part Of Product Design.

In any event, ATF's decision is arbitrary and capricious. Foremost, the FAI-15 Antithesis's capability to fire multiple projectiles is not "in spite of" its broader design, *see infra*, but even if it were, ATF cannot simply disregard that capability. The statutory text concerns simply how the weapon is "designed . . . and made," 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c), and does not create a hierarchy of design features. ATF conceded that both the FAI-15 Antithesis's marketing and its capability support the view that the weapon is not a rifle: ATF acknowledged that the FAI-15 Antithesis is "capable of firing shotshells," *e.g.*, FAI-15 Antithesis Classification Letter at 4, and acknowledged that the FAI-15 Antithesis is marketed as firing shotshells, *id.* (recognizing Franklin's "decision to market [the] firearm as capable of firing shotshells"). Yet ATF concluded that "the marketing of a weapon and its capabilities" are not determinative of design. *Id*.

This is arbitrary and capricious. Under the plain meaning of "designed . . . and made," ***all*** of a product's marketed capabilities are part of its design. Indeed, the word "design" means to "decide upon the look and functioning of an object." *Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 979 (E.D.N.C. 2015) (stating that "the court has found no case bearing on [the word's] interpretation" and quoting the Oxford English Dictionary). Manufacturer intent as reflected by marketing ("decide upon") and capability ("functioning"), therefore, is critical to discerning design. While an unmarketed capability may not be part of the product's design—tennis balls, for example, are capable of being used to play fetch with dogs but generally are not designed for that purpose—capability ***plus manufacturer marketing*** changes that. Because of tennis balls' fetch-

game capability, a tennis ball marketed to play fetch plainly is designed for fetch games. In the same way, the FAI-15 Antithesis—which ATF concedes is both capable of firing shotshells and marketed by Franklin to fire shotshells—is designed to fire shotshells.

*Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), which ATF has previously cited, only underscores that ATF's analysis was ***not*** reasonable by explaining that manufacturer intent controls and that examining capability is crucial for discerning that intent. Noting that manufacturers could "evade the NFA's carefully constructed regulatory regime" through mere "asserti[on]" if a manufacturer's litigation position controlled, the *Sig Sauer* court adopted "an objective approach to ferreting out a party's intent." *Id.* at 601–02. The court did not conclude that manufacturer intent is entitled to little weight—to the contrary, the "[manufacturer's] intent" was the court's entire inquiry. To determine how the product was "intended to be used," the court relied largely on "the uses of which [the product] is capable." *Id.* ATF was unreasonable to disregard the FAI-15 Antithesis's capabilities here.

ATF's resistance to acknowledging that a rifle-bored weapon firing multiple projectiles is not a rifle seemed to rest on its view that rifle bores are not "traditionally used for this purpose." FAI-15 Antithesis Classification Letter at 4. But innovative manufacturer design is no less manufacturer design than traditional designs. The statutory definition of "rifle" centers not on traditional usage but on manufacturer design, and ATF's focus on other factors makes its order arbitrary and capricious. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if agency "relied on factors which Congress had not intended it to consider"). For this additional reason, ATF's decision should be enjoined.

### C.     Multiple-Projectile Capability Is Central To The FAI-15 Antithesis's Design.

ATF's assertion that the FAI-15 Antithesis fires multiple projectiles "*in spite* of" the weapon's design, FAI-15 Antithesis Classification Letter at 4, ignores the record evidence and

thus is arbitrary and capricious for this additional reason. ATF "failed to consider" numerous "important aspect[s]" of the issue, *State Farm*, 463 U.S. at 43, and its "explanation for its decision" "runs counter to the evidence before [it]," *id.*

*First*, ATF concluded that the FAI-15 Antithesis's multiple-projectile capability counters its intended design because its rifled bore is "disadvantageous" for firing multiple projectiles. FAI-15 Antithesis Classification Letter at 4. But the premise is incorrect, and the conclusion is a non sequitur. When firing multiple projectiles, as Franklin explained to ATF, *see* Am. Compl. Ex. B at 2, a rifled bore is equally effective as a smooth bore in certain situations and ***more*** effective in others. ATF observed that with a rifled bore "the twist of the shot column traveling down the bore will spread the shot pattern." FAI-15 Antithesis Classification Letter at 4. However, ATF did not explain why it thought that significant. *See Indep. Petrol. Ass'n of Am. v. DeWitt*, 279 F.3d 1036, 1042 (D.C. Cir. 2002) (agency acted arbitrarily and capriciously by offering "only an unusually raw ipse dixit"). Nor did it address the fact that projectile stabilization is not needed in short-range engagements, *see* Am. Compl. Ex. B at 2, or that rapidly spreading the shot pattern enhances a weapon's utility in certain contexts such as close-range shots at gamebirds, *see* Antithesis 2020 Explanation Letter at 4. Because ATF "summarily disregarded [these] argument[s]," it did not give a "'satisfactory explanation for [its] action.'" *Ovintiv USA, Inc. v. Haaland*, No. 1:21-CV-2552-RCL, 2023 WL 2708821, at *13 (D.D.C. Mar. 30, 2023).

ATF acknowledged that a weapon with a rifled bore that fires multiple projectiles has certain "commercial advantage," FAI-15 Antithesis Classification Letter at 4, did not dispute Franklin's "great results" when firing shot from the weapon, *see* Am. Compl. Ex. B at 3, and did not suggest that its own testing found the weapon ineffective at firing shot, *see* FAI-15 Antithesis Classification Letter at 1. ATF might purchase a different weapon were it a consumer but, as it

conceded, other consumers have good reason to purchase a rifle-bored weapon that fires shot. The statutory question concerns manufacturer intent, not whether the manufacturer designed the product the way ATF would have.

In any event, even if a rifled bore were always disadvantageous for firing shot (and it is not), that would not mean the FAI-15 Antithesis is not *designed* to fire shot. After all, a product can be designed for a certain end even if each component part does not advance that end—a racecar designed for speed still has brakes. ATF stated that "not all *bores* are designed to expel multiple projectile ammunition," FAI-15 Antithesis Classification Letter at 4 (emphases altered), but that exhibits another misunderstanding of the statutes, which concern the design of the ***firearm***.

*Second*, ATF purported to rely on objective evidence but in fact ignored the abundant objective evidence in the record establishing the centrality of multiple-projectile capability to the FAI-15 Antithesis's design. As Franklin explained, the weapon is inscribed with the notation ".410/.45LC," which refers to the weapon's ability to fire single-projectile and multiple-projectile cartridges. *See* Am. Compl. Ex. B at 3. That inscription plainly constitutes objective evidence of manufacturer intent, but ATF ***never even mentioned it***. *See State Farm*, 463 U.S. at 43 (agency action arbitrary and capricious when it has "entirely failed to consider an important aspect of the problem"). ATF also acknowledged that the FAI-15 Antithesis is marketed to fire multiple projectiles, as discussed, but appeared to give that fact no weight despite that its own rules confirm that marketing constitutes objective evidence. *See* 27 C.F.R. § 478.92(c) (requiring submission of "marketing materials" with certain classification requests). ATF acknowledged that "the manufacturer's purported use" is a relevant factor, FAI-15 Antithesis Classification Letter at 4, but did not discuss how it weighed the fact that the purported use of the FAI-15 Antithesis involves firing multiple projectiles. ATF's classification is independently unlawful for these reasons as

well.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion for summary judgment. Plaintiffs further request that the Court order ATF to promulgate the necessary forms and procedures for authorization of GCA-only shotguns within thirty days of the Court's order.

|  |  |  |
|---|---|---|
| June 26, 2023 | By: | /s/ Stephen J. Obermeier |
|  |  | Stephen J. Obermeier |
|  |  | Jeremy J. Broggi |
|  |  | William K. Lane III |
|  |  | Michael J. Showalter |
|  |  | Boyd Garriott |
|  |  | **WILEY REIN LLP** |
|  |  | 2050 M Street NW |
|  |  | Washington, DC 20036 |
|  |  | Tel: 202.719.7000 |
|  |  | Fax: 202.719.7049 |
|  |  | SObermeier@wiley.law |
|  |  | JBroggi@wiley.law |
|  |  | WLane@wiley.law |
|  |  | MShowalter@wiley.law |
|  |  | BGarriott@wiley.law |

Benjamin J. Sand (ND ID #07981)
**CROWLEY FLECK PLLP**
100 W Broadway Ave
Bismarck, ND 58501
Tel: 701.223.6585
Fax: 701.222.4853
bsand@crowleyfleck.com

*Counsel for Plaintiffs*

39